FILED
2023 Jul-27  PM 02:08
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | | |
|---|---|---|
| **GARY PORTER,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **CASE NO.:  4:20-cv-01342-MHH** |
| | } | |
| **KILOLO KIJAKAZI,** | } | |
| **Commissioner,** | } | |
| **Social Security Administration,** | } | |
| | } | |
| **Defendant.** | } | |

## **MEMORANDUM OPINION**

Gary Porter has asked the Court to review a final adverse decision of the Commissioner of Social Security.  The Commissioner denied Mr. Porter's claim for supplemental security income based on an Administrative Law Judge's finding that Mr. Porter was not disabled.  (Doc. 11-3, pp. 23-28).  Mr. Porter argues that he is entitled to relief because the Administrative Law Judge—the ALJ—disregarded the opinions of Dr. Jarrod Warren and Dr. Jonathan Fuller, erred in finding Mr. Porter's degenerative joint disease and hypertension were non-severe impairments, and improperly relied on the testimony of a vocational expert.  The Court examines these arguments to resolve Mr. Porter's administrative appeal.

1

## LEGAL STANDARD FOR SOCIAL SECURITY ADMINISTRATIVE PROCEEDINGS

To succeed in his administrative proceedings, Mr. Porter had to prove that he was disabled. *Gaskin v. Comm'r of Soc. Sec.*, 533 Fed. Appx. 929, 930 (11th Cir. 2013). "A claimant is disabled if he is unable to engage in substantial gainful activity by reason of a medically-determinable impairment that can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least 12 months." 42 U.S.C. § 423(d)(1)(A).[1]

To determine if a claimant is disabled, an ALJ follows a five-step sequential evaluation process. The ALJ considers:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a residual functional capacity ("RFC") assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's RFC, age, education, and work experience.

---

[1] Title II of the Social Security Act governs applications for benefits under the Social Security Administration's disability insurance program. Title XVI of the Act governs applications for Supplemental Security Income or SSI. "For all individuals applying for disability benefits under title II, and for adults applying under title XVI, the definition of disability is the same." https://www.ssa.gov/disability/professionals/bluebook/general-info.htm (lasted visited June 12, 2023).

*Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011); *see* 20 C.F.R. § 416.920. "The claimant has the burden of proof with respect to the first four steps." *Wright v. Comm'r of Soc. Sec.*, 327 Fed. Appx. 135, 136-37 (11th Cir. 2009). "Under the fifth step, the burden shifts to the Commissioner to show that the claimant can perform other jobs that exist in the national economy." *Wright*, 327 Fed. Appx. at 137.

## ADMINISTRATIVE PROCEEDINGS

Mr. Porter applied for supplemental security income on January 10, 2018. (Doc. 11-6, p. 2). Mr. Porter alleged that his disability began on January 9, 2018. (Doc. 11-6, p. 2). In his application, Mr. Porter described disabling conditions that included problems with his ankle and the inability to straighten his ring finger. (Doc. 11-7, p. 3). On October 22, 2018, the Social Security Administration initially denied Mr. Porter's claim. (Doc. 11-5, p. 2). On December 19, 2018, Mr. Porter appealed the decision and requested a hearing before an administrative law judge. (Doc. 11-5, p. 10). That hearing took place on December 17, 2019. (Doc. 11-3, p. 34). A vocational expert testified at the hearing. (Doc. 11-3, pp. 41-42).

The ALJ issued an unfavorable decision on January 16, 2020, finding that Mr. Porter was not disabled as defined by the Social Security Act. (Doc. 11-3, pp. 23-28). On August 24, 2020, the Appeals Council denied Mr. Porter's request for

review, (Doc. 11-3, pp. 2-5), making the Commissioner's decision final and a proper candidate for this Court's judicial review.  *See* 42 U.S.C. § 405(g).

## EVIDENCE IN THE ADMINISTRATIVE RECORD

Mr. Porter's records are sparse.  He does not have a treating physician.  His record consists mostly of forms he completed in support of his application and consultative examinations performed in conjunction with his application.  The record contains one report from a medical doctor.

### *Mr. Porter's Reports*

To support his disability application, Mr. Porter completed two SSA function reports.  In those function reports, Mr. Porter explained how his medical impairments affected his ability to work.

### *Mr. Porter's January 17, 2018 Function Report*

On January 17, 2018, at the request of the SSA, Mr. Porter completed a function report.  (Doc. 11-7, pp. 18-28).[2]  Mr. Porter indicated that he was able to work before the onset of his medical impairments, and that he "still tr[ied] to work." (Doc. 11-7, p. 22).  Mr. Porter stated that he traveled by walking and did not drive. (Doc. 11-7, p. 24).  He indicated his conditions had changed his ability to walk and work, but he did not describe how.  (Doc. 11-7, p. 26).

---

[2] Mr. Porter dated the document January 17, 2008.  Presumably he actually completed the report on January 17, 2018, because Mr. Porter submitted the report in response to a letter from the SSA dated January 12, 2018.  (Doc. 11-7, pp. 19, 28).

Mr. Porter marked that his conditions affected his ability to lift, squat, bend, stand, walk, sit, kneel, and use his hands.  (Doc. 11-7, p. 26).  Mr. Porter stated he "[couldn't] lift [his] legs [or] feet" and that he had "bad knees."  (Doc. 11-7, p. 26). He indicated he could walk a quarter of a mile before needing to rest for 10 minutes, (Doc. 11-7, p. 26), and he could pay attention all day, (Doc. 11-7, p. 26).  Mr. Porter reported that he could follow written instructions "[un]til [they were] finish[ed]" and follow spoken instructions "complete[ly]," but he did not finish what he started. (Doc. 11-7, p. 26).

*Mr. Porter's July 1, 2018 Function Report*

On July 1, 2018, with the help of his brother Benjamin Porter, Mr. Porter completed another function report at the request of the SSA.  (Doc. 11-7, pp. 51-60). Mr. Porter noted that he could work before January 2018.  (Doc. 11-7, p. 54).  Mr. Porter indicated that pain prevented him from sleeping; he could not use his hands well while dressing; and his arms and hand hurt when he fed himself.  (Doc. 11-7, p. 54).

Mr. Porter stated that he could not drive because his feet could not push the brake hard enough to stop, and he could not grip the steering wheel with his hands.

5

(Doc. 11-7, p. 56).[3]  Mr. Porter indicated he had worked in carpentry but could not use his hands anymore.  (Doc. 11-7, p. 58).

Mr. Porter noted that his medical conditions affected his ability to lift, squat, bend, stand, reach, walk, kneel, climb stairs, and use his hands.  (Doc. 11-7, p. 58). He also noted that when something took a "long time to complete," he would lose "concentration about what [he was] doing."  (Doc. 11-7, p. 58).  Mr. Porter stated that he could not follow written or oral instructions well, and that he lost concentration easily.  (Doc. 11-7, p. 58).  Mr. Porter indicated he used a cane when his "legs and knees hurt badly," but a doctor had not prescribed a cane because he had not visited a doctor.  (Doc. 11-7, p. 59).

### Mr. Porter's Medical Records

Mr. Porter has three medical records in the record on appeal.  Dr. Jonathan Fuller, D.O. prepared a report based on a medical examination of Mr. Porter that Dr. Fuller conducted at the request of the SSA on September 5, 2018.  (Doc. 11-8, pp. 2-7).  Dr. Kennon Hager, M.D. prepared x-ray evaluation reports based on x-rays performed on Mr. Porter on October 15, 2018 at the request of the SSA.  (Doc. 11-8, pp. 8-12).  And, at Mr. Porter's attorney's request, Dr. Jarrod Warren, M.D.

---

[3] During a medical exam, Mr. Porter reported that he could not drive because he had a DUI on his record, and he could not afford to pay the fee to have his license reinstated.  (Doc. 11-8, p. 3).

prepared a report based on a medical evaluation of Mr. Porter on December 4, 2019, the month of Mr. Porter's ALJ hearing.  (Doc. 11-8, pp. 13-16).

### Dr. Fuller's Report

When he visited Dr. Fuller, Mr. Porter complained of pain, weakness, stiffness in his hands, low back pain, and difficulty with balance.  (Doc. 11-8, p. 3).  Mr. Porter stated he had experienced symptoms for four to five months intermittently, and the symptoms had progressively gotten worse.  (Doc. 11-8, p. 3).  Dr. Fuller noted that Mr. Porter had "no significant past medical history" and did not regularly take medication.  (Doc. 11-8, p. 3).  Mr. Porter described difficulties he had getting dressed, walking to the mailbox, sleeping on his back, and performing other daily activities.  (Doc. 11-8, p. 3).

Dr. Fuller noted that Mr. Porter experienced tenderness when lying flat on his back, but the tenderness resolved when Mr. Porter changed positions.  (Doc. 11-8, p. 3).  In the range of motion chart attached with Dr. Fuller's report, Dr. Fuller recorded that Mr. Porter had lower than normal range of motion in his shoulder, elbow, and wrist, and minor reductions in the hip and knee.  (Doc. 11-8, pp. 6-7). Dr. Fuller recorded normal range of motion in the ankle.  (Doc. 11-8, p. 6).  Dr. Fuller indicated that Mr. Porter had full range of motion in his neck and good range of motion in his cervical spine and dorsolumbar spine.  (Doc. 11-8, p. 3).  Dr. Fuller noted that Mr. Porter exhibited a moderate decrease in range of motion in his hips,

knees, shoulders, elbow, and wrists.  (Doc. 11-8, pp. 3-4).  He noted that Mr. Porter was unable to walk on his heals or toes and exhibited a "significant decrease in dexterity and strength of the hands bilaterally."  (Doc. 11-8, p. 4).

The range of motion exam included an examination of the extension and flexion of each of Mr. Porter's finger joints.  (Doc. 11-8, p. 7).  For each finger and joint, Mr. Porter exhibited half of the normal range of motion for flexion, but the full normal range of motion for extension.  (Doc. 11-8, p. 7).  Based on his exam, Dr. Fuller indicated that Mr. Porter had "Severe Restriction" in his dexterity and "Severe Weakness" in his grip strength.  (Doc. 11-8, p. 7).

Based on his examination, Dr. Fuller assessed Mr. Porter with "[a]rthralgia, unspecified joint" and "[e]levated blood pressure reading in office with diagnosis of hypertension."  (Doc. 11-8, p. 4).  Under the treatment section of Dr. Fuller's report, addressing the assessment of "[a]rthralgia, unspecified joint," Dr. Fuller wrote that Mr. Porter's "mult[i]-joint weakness and pain does seem to show physical disability that would impair patient in doing his job considering his education level."  (Doc. 11-8, p. 4).  Dr. Fuller noted that he could not determine if this impairment was "permanent or could be fix[ed] medically;" further evaluation was necessary.  (Doc. 11-8, p. 4).  Dr. Fuller recommended that Mr. Porter see a primary care physician for further evaluation and treatment and that Mr. Porter take a daily NSAID or acetaminophen such as Tylenol.  (Doc. 11-8, p. 4).

8

With respect to Mr. Porter's elevated blood pressure, Dr. Fuller reiterated that Mr. Porter needed a primary care physician. (Doc. 11-8, p. 4). Dr. Fuller stated that the high blood pressure may be a "one-off . . . reading," or it could be "undiagnosed hypertension." (Doc. 11-8, p. 4). Dr. Fuller recommended that Mr. Porter maintain a daily log of blood pressure and that Mr. Porter bring his log and blood pressure cuff to his appointment with a primary care physician. (Doc. 11-8, p. 4).

### *Dr. Hager's X-Ray Evaluations*

On October 15, 2018, at the request of the SSA, Mr. Porter obtained x-rays of his knees and hands. (Doc. 11-8, p. 8). Dr. Hager, the interpreting radiologist, prepared a report of his findings for each of the x-ray images. (Doc. 11-8, pp. 9-12).

The images of Mr. Porter's left hand showed "[m]inimal degenerative changes . . . at the base of the thumb with minor DJD in the PIP joint of the fourth digit." (Doc. 11-8, p. 9).[4] Dr. Hager found no additional focal or acute pathology. (Doc. 11-8, p. 9).

In Mr. Porter's right hand, Dr. Hager found minor degenerative changes in the thumb that were consistent with minimal osteoarthritis. (Doc. 11-8, p. 10). Dr.

---

[4] The four fingers on the hand (excluding the thumb) have three joints. The outermost joint, at the base of the fingernail, is called the distal interphalangeal joint (DIP). The middle joint is called the proximal interphalangeal joint (PIP), and the joint at the base of the finger, where the finger connects to the hand, is called the metacarpophalangeal joint (MP). Each finger has another joint called the carpometacarpal joint (CMC), which is located at the very base of the finger bone where the finger attaches to the wrist bones in the hand. https://www.assh.org/handcare/safety/joints (last visited June 12, 2023).

Hagar noted that only minimal changes were otherwise identified and that "[n]o fracture, malalignment, or foreign body" was evident.  (Doc. 11-8, p. 10).  His impression for Mr. Porter's right hand was "[m]inimal osteoarthritis, primarily in the thumb."  (Doc. 11-8, p. 10).

In Mr. Porter's left and right knees, Dr. Hager noted minor marginal patellar osteophytic spurring and the presence of mild diffuse demineralization.  (Doc. 11-8, p. 11).  He found no abnormalities other than "[m]inimal DJD."  (Doc. 11-8, pp. 11-12).

*Dr. Warren's Report*

At the request of Mr. Porter's attorney, Dr. Warren evaluated Mr. Porter on December 4, 2019.  (Doc. 11-8, pp. 13-16).  At the appointment, Mr. Porter "mostly complain[ed] of generalized joint pain[]" in his feet, ankles, knees, and hands.  (Doc. 11-8, p. 13).  Mr. Porter also complained of swelling and stiffness that were worse in the morning and improved throughout the day.  (Doc. 11-8, p. 13).  Mr. Porter told Dr. Warren that he (Mr. Porter) was unable to sit still for long periods.  (Doc. 11-8, p. 13).  In addition, Mr. Porter stated he was extremely stiff after sitting for extended periods.  (Doc. 11-8, p. 13).  Mr. Porter stated he had always worked in manual labor, but he was "unable to do this anymore because he [could not] grasp items due to swelling and stiffness in his hands."  (Doc. 11-8, p. 13).  Mr. Porter

explained that he had not taken over-the-counter or prescription medication to treat his symptoms.  (Doc. 11-8, p. 13).

When Dr. Warren examined him, Mr. Porter had full and normal range of motion in his neck, 4/5 grip strength in both hands, 4+/5 bicep strength in both arms, 4+/5 triceps strength in both arms, and 1+ biceps reflex in both arms.  (Doc. 11-8, p. 14).  Mr. Porter was not able to "extend the 4th of 5th digits completely."  (Doc. 11-8, p. 14).

Dr. Warren completed a physical capacities form for Mr. Porter.  (Doc. 11-8, p. 16).  On the form, Dr. Warren marked that Mr. Porter could stand for one hour at a time, could stand for three to four hours in an eight-hour day, could constantly lift up to five pounds, could frequently lift up to ten pounds, could occasionally lift up to 25 pounds, and should never lift more than 25 pounds.  (Doc. 11-8, p. 16).

Regarding Mr. Porter's left hand, Dr. Warren indicated that Mr. Porter could not perform handling or fingering, could occasionally perform reaching, and could frequently perform feeling.  (Doc. 11-8, p. 16).  Regarding Mr. Porter's right hand, Dr. Warren indicated that Mr. Porter could never perform handling, occasionally perform reaching and fingering, and constantly perform feeling.  Dr. Warren indicated that the condition causing these limitations was osteoarthritis.  (Doc. 11-8, p. 16).

Dr. Warren made findings of generalized osteoarthritis, untreated hypertension, and insomnia. (Doc. 11-8, p. 15). Dr. Warren noted that Mr. Porter's only other evaluation was his appointment with Dr. Fuller and that Mr. Porter had not had age-appropriate "screen studies" performed. (Doc. 11-8, p. 15). Dr. Warren believed Mr. Porter's "quality of life could be greatly improved with medical therapy to treat his arthritis" because the arthritis was likely to progress as Mr. Porter aged. (Doc. 11-8, p. 15).

### State Agency Medical Consultant Assessment

On October 22, 2018, Dr. Robert H. Heilpern, M.D., a state agency medical consultant, reviewed the medical evidence available to him at that time, the x-ray evaluations from Dr. Hager and the report from Dr. Fuller. (Doc. 11-4, pp. 9-10). [5]

Dr. Heilpern concluded that Mr. Porter had two medically determinable impairments—"Other and Unspecified Arthropathies" and "Essential Hypertension." (Doc. 11-4, p. 11). Dr. Heilpern concluded that neither impairment was severe and that the "[i]mpairment or combination of impairments [did] not significantly limit physical or mental ability to do basic work activities." (Doc. 11-4, p. 11).

---

[5] In October 2018, Mr. Porter's appointment with Dr. Warren had not taken place, so Dr. Heilpern did not address Dr. Warren's report. (Doc. 11-8, pp. 13-16).

Dr. Heilpern found that Dr. Fuller's finding that Mr. Porter had a significant decrease in strength and dexterity in both of his hands was not well-supported by the examination.  (Doc. 11-4, p. 10).  He noted that Dr. Fuller did not mention atrophy, joint warmth, swelling, or tenderness to support his finding.  (Doc. 11-4, p. 10).

After viewing Dr. Hager's x-ray reports, Dr. Heilpern found that no medically determinable impairment for inflammatory arthritis was present as suggested by Dr. Fuller.  (Doc. 11-4, p. 10).  Dr. Heilpern noted that Mr. Porter alleged ankle problems, but Dr. Fuller's exam showed Mr. Porter had full range of motion in his ankle and normal strength.  (Doc. 11-4, p. 10).  Dr. Heilpern concluded that the evidence did not indicate a medically determinable impairment for the ankle.  (Doc. 11-4, p. 10).

Dr. Heilpern stated that Mr. Porter's symptoms of pain and weakness could reasonably be expected to be a product of Mr. Porter's medically determinable impairments.  (Doc. 11-4, p. 11).  Because Mr. Porter's x-rays showed only minimal degenerative joint disease, and because Dr. Fuller's examination showed no abnormalities at the ankle, Dr. Heilpern found that the objective medical evidence did not substantiate Mr. Porter's statements about the intensity, persistence, and functionally limiting effects of his symptoms.  (Doc. 11-4, p. 11).  According to Dr. Heilpern, Mr. Porter's statements regarding his symptoms were partially consistent with the objective evidence in the file.  (Doc. 11-4, p. 11).

Dr. Heilpern acknowledged that Dr. Fuller's opinions about Mr. Porter's abilities and limitations were more restrictive than his own opinions. (Doc. 11-4, p. 12). Dr. Heilpern found that Dr. Fuller's opinion was "an overestimate of the severity of [Mr. Porter's] restrictions/limitations." (Doc. 11-4, p. 12). After consideration of all of the medical evidence in the record, Dr. Heilpern opined that Mr. Porter was not disabled. (Doc. 11-4, p. 12).

### *Mr. Porter's Administrative Hearing*

At his December 17, 2019 administrative hearing, Mr. Porter was 61 years old and had a high school education. (Doc. 11-3, p. 35). He had no past relevant work, and he had not had significant earnings for 15 to 16 years; he received financial support from his brother. (Doc. 11-3, pp. 35-37).

Mr. Porter testified that he "c[ould]n't hold anything." (Doc. 11-3, p. 38). He explained that his hands ached "all the time." (Doc. 11-3, p. 38). Mr. Porter testified that he could hold a drink in his right hand, but he was likely to drop it, and he could not hold a drink in his left hand. (Doc. 11-3, p. 38). He stated that he could button his shirts, but it took a while to button them. (Doc. 11-3, p. 38). Mr. Porter stated that he could not use a round doorknob with either hand, and he could not "twist [a] Coca-Cola top off" with either hand. (Doc. 11-3, p. 39). Mr. Porter indicated that his ankles and feet were a problem for him. (Doc. 11-3, p. 39).

Mr. Porter stated he had not seen a doctor because he did not have money or health insurance. (Doc. 11-3, p. 39). Mr. Porter indicated that he last had health insurance when he worked at Fruit of the Loom, but that was "years and years" earlier. (Doc. 11-3, pp. 39-40). He had not worked since January of 2018. (Doc. 11-3, p. 40).

Mr. Porter stated he could stand for about 40-45 minutes before having to sit down or move around because he did not have "any balance left." (Doc. 11-3, p. 40). He stated that his right hand was stiff, and he could not get any grip with his left hand. (Doc. 11-3, p. 40). He was able to make a fist with his right hand, but it hurt when he did. (Doc. 11-3, pp. 40-41). Mr. Porter indicated that he is right-handed. (Doc. 11-3, p. 41).

Renee Smith testified as a vocational expert. (Doc. 11-3, p. 41). Ms. Smith stated that Mr. Porter had no relevant work experience within the 15 years preceding the hearing. (Doc. 11-3, pp. 41-42). The ALJ posed this hypothetical to Ms. Smith:

> I'd like you to assume an individual of Mr. Porter's age, education, work experience who could perform work at a light exertional level with the following limitations: no climbing of ladders, scaffolds; occasional climbing of ramps and stairs; occasional balancing, kneeling, crouching, stooping, no crawling; frequent handling, fingering, feeling bilaterally; only occasional exposure to extreme heat and cold; occasional exposure to vibration. He should avoid all hazardous machinery and unprotected heights. I'm assuming based on Mr. Porter's work history, he would have no transferrable skills to any position that

> could be performed by an individual with those
> limitations?

(Doc. 11-3, p. 42).  Ms. Smith testified that the hypothetical person would not have transferrable skills to a position that could be performed by someone with those limitations, and that her testimony was consistent with the Dictionary of Occupational Titles.  (Doc. 11-3, p. 42).  In response to Mr. Porter's attorney's question, Ms. Smith testified that a person capable of work at the medium exertion level "should be able to lift up to 50 pounds on an occasional basis."  (Doc. 11-3, p. 42).

## THE ALJ'S DECISION

The ALJ found that Mr. Porter had not engaged in substantial gainful activity since January 10, 2018, his application date.  (Doc. 11-3, p. 25).  The ALJ determined that Mr. Porter suffered from the medically determinable impairments of hypertension and minimal degenerative joint disease, but the impairments were not severe within the meaning of the Social Security Act; the impairments did not significantly limit (and were not expected to significantly limit) Mr. Porter's ability to perform basic work-related activities for 12 consecutive months.  (Doc. 11-3, p. 25).  Because the ALJ found at step two that Mr. Porter did not have an impairment or a combination of impairments that significantly limited his ability to perform basic work-related activities, the ALJ did not reach steps three through five of the five-step evaluation process.

To support his decision, the ALJ discussed and summarized Mr. Porter's visits to Dr. Fuller, the x-ray clinic, and Dr. Warren.  (Doc. 11-3, pp. 27-28).  The ALJ noted that the October 15, 2018 x-rays of Mr. Porter's hands revealed minimal arthritic changes, minimal degenerative changes at the base of the left thumb, minor degenerative changes in the middle of the left ring finger, and minimal osteoarthritis in the right thumb.  (Doc. 11-3, p. 27).  The ALJ also noted that the x-rays of Mr. Porter's knees showed minimal marginal osteophytic spurring in both knees and mild diffuse demineralization.  (Doc. 11-3, p. 27).  The ALJ found the x-ray findings were "markedly inconsistent with the degree of pain and functional restriction" Mr. Porter alleged and "contrast[ed] considerably with the severely restricted manual grip strength and dexterity [Mr. Porter] demonstrated" at his consultative medical examination with Dr. Fuller.  (Doc. 11-3, p. 27).  The ALJ pointed out that x-ray findings are objective, but range of motion exams, such as the one Dr. Fuller performed, were vulnerable to limitation by a patient.  (Doc. 11-3, p. 27).  The ALJ stated that in the absence of objective evidence establishing more than minimal joint abnormalities, he could not find a basis for a severe musculoskeletal impairment. (Doc. 11-3, p. 27).

The ALJ found Dr. Warren's physical capacities report unpersuasive.  (Doc. 11-3, pp. 27-28).  The ALJ reiterated that the x-rays of Mr. Porter's hands showed minimal arthritic changes and noted that Dr. Warren appeared to rely on Mr. Porter's

self-reports, such as his reported inability to grasp with either hand or to stand up for long periods.  (Doc. 11-3, p. 28).  The ALJ pointed out that Dr. Warren found that Mr. Porter had 4/5 grip strength in both of his hands, a finding that did not support limitations in Mr. Porter's ability to use his hands for gross manipulation.  (Doc. 11-3, p. 28).

The ALJ also relied on the findings of Dr. Heilpern, a state agency medical consultant.  (Doc. 11-3, p. 27).  The ALJ noted that Dr. Heilpern reviewed the records available as of October 22, 2018, and concluded that Mr. Porter's hypertension and minimal degenerative joint disease were not severe impairments. (Doc. 11-3, p. 27).

The ALJ assessed information provided by Mr. Porter.  (Doc. 11-3, pp. 26-27).  The ALJ noted that in his first function report, Mr. Porter indicated that he could pay attention all day and had no difficulty following instructions or completing tasks, (Doc. 11-3, p. 26), but in the second function report that Mr. Porter completed with the help of his brother, Mr. Porter stated that he could pay attention for only about two minutes and had problems completing tasks and following instructions because he easily lost concentration.  (Doc. 11-3, p. 26).  The ALJ noted that the disabling conditions Mr. Porter listed in his report concerned his ankle and his ring finger, but at the administrative hearing, Mr. Porter testified that he could not grasp anything in his left hand and tended to drop things he tried to hold in his right hand.

(Doc. 11-3, pp. 26-27).  The ALJ added that the medical evidence in the record was extremely limited, but the available objective medical evidence did not substantiate Mr. Porter's allegations regarding the severity of his impairments.  (Doc. 11-3, p. 27).

After considering the evidence in the record, the ALJ found that Mr. Porter had not been under a disability as defined by Social Security Act since the date he filed his application.  (Doc. 11-3, p. 28).

## STANDARD OF REVIEW

The scope of review in this matter is limited.  "When, as in this case, the ALJ denies benefits and the Appeals Council denies review," a district court reviews the ALJ's "'factual findings with deference'" and his "'legal conclusions with close scrutiny.'"  *Riggs v. Comm'r of Soc. Sec.*, 522 Fed. Appx. 509, 510-11 (11th Cir. 2013) (quoting *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001)).

A district court must determine whether there is substantial evidence in the record to support the ALJ's factual findings.  *See* 42 U.S.C. § 405(g).  "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004) (quoting *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997)).  In evaluating the administrative record, a district court may not "decide the facts anew, reweigh the evidence," or substitute its judgment

for that of the ALJ. *Winschel v. Comm'r of Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th Cir. 2011) (internal quotations and citations omitted). If substantial evidence supports the ALJ's factual findings, then a district court "must affirm even if the evidence preponderates against the Commissioner's findings." *Costigan v. Comm'r, Soc. Sec. Admin.*, 603 Fed. Appx. 783, 786 (11th Cir. 2015) (citing *Crawford*, 363 F.3d at 1158-59).

With respect to an ALJ's legal conclusions, a district court must determine whether the ALJ applied the correct legal standards. If the court finds an error in the ALJ's application of the law, or if the court finds that the ALJ failed to provide sufficient reasoning to demonstrate that the ALJ conducted a proper legal analysis, then the court must reverse the ALJ's decision. *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991).

## DISCUSSION

### *Dr. Warren's Report*

Mr. Porter contends that the ALJ did not give proper weight to Dr. Warren's report. (Doc. 13, pp. 1, 9). Mr. Porter cites many Eleventh Circuit opinions and seems to argue that the ALJ substituted his judgment for Dr. Warren's medical opinion. (Doc. 13, pp. 11-15). The cases Mr. Porter cites pre-date March 27, 2017. (Doc. 13, pp. 11-15). Because Mr. Porter filed his claim after March 27, 2017, the Court must apply the new regulation found in 20 C.F.R. § 416.920c with respect to

this issue, and the decisions that Mr. Porter cites are not helpful.  *See Harner v. Soc. Sec. Admin., Comm'r*, 38 F.4th 892, 894 (11th Cir. 2022).  In considering the report of Dr. Warren, the ALJ properly articulated how he considered the medical opinion in accordance with the new regulations.

The new regulations "instruct[] administrative law judges to give a treating physician's opinion no deference and instead to weigh medical opinions based on their persuasiveness" in accordance with the regulation.  *Harner*, 38 F.4th at 894. Under the new regulations, an ALJ must consider five factors when weighing the persuasiveness of a medical opinion:  supportability, consistency, the medical source's relationship with the claimant, the medical source's specialization, and "other factors."  20 C.F.R. § 416.920c(1)-(5).20 C.F.R. § 416.920c(1)-(5).  The most important factors are supportability and consistency, and an ALJ must "explain how [the ALJ] considered the supportability and consistency factors for a medical source's medical opinions."  20 C.F.R. § 416.920c(b)(2).  An ALJ does not have to articulate how he considered other factors.  20 C.F.R. § 416.920c(b)(2) ("We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section . . . when we articulate how we consider medical opinions . . . in your case record.").

Here, substantial evidence supports the ALJ's finding that Dr. Warren's report was unpersuasive.  To address the supportability factor, the ALJ correctly noted that

Mr. Porter's x-rays showed minimal arthritic changes, so that objective evidence did not support Dr. Warren's findings of severe restrictions in Mr. Porter's hands.  (Doc. 11-3, p. 28).  The ALJ stated that Dr. Warren seemed to base his findings on Mr. Porter's self-reported inabilities, not the objective medical evidence.  (Doc. 11-3, p. 28).  The ALJ properly articulated how he considered the supportability factor concerning Dr. Warren's opinion.

To address the consistency factor, the ALJ pointed to inconsistencies between the results of Dr. Warren's examination and his finding of severe limitations in Mr. Porter's hands.  (Doc. 11-3, pp. 27-28).  Specifically, the ALJ noted that Dr. Warren's assessment of 4/5 grip strength in Mr. Porter's hands contradicted his finding that Mr. Porter could not perform handling or fingering with his left hand or handling with his right hand.  The ALJ reiterated that Mr. Porter's x-rays showed only minimal arthritic changes, contradicting the severity of the limitations Mr. Porter reported at the administrative hearing and Dr. Warren's findings.  The ALJ correctly found Dr. Warren's opinion inconsistent with the objective medical evidence and properly articulated his consideration of the consistency factor.  (Doc. 11-3, pp. 27-28).

### *Dr. Fuller's Report*

Mr. Porter contends that the ALJ erred by disregarding Dr. Fuller's evaluation.  Substantial evidence supports the ALJ's stated reasons for his decision

not to rely on Dr. Fuller's assessment.  The ALJ correctly stated that the x-ray results "contrast considerably" with the "severely restricted" grip strength and dexterity Mr. Porter exhibited to Dr. Fuller.  (Doc. 11-3, p. 27).  If Mr. Porter had the severe restrictions in his hands he demonstrated during the range of motion exams with Dr. Fuller, his objective x-ray results would have displayed more than minimal joint abnormalities.  If Mr. Porter could not hold "anything" or use a round door-knob as he reported during the administrative hearing, (Doc. 11-3, pp. 38-39), his x-rays would show more than minimal osteoarthritis.

### *The ALJ's Step Two Finding*

Mr. Porter contends that substantial evidence does not support the ALJ's finding at step two that he did not have a severe impairment.  (Doc. 13, p. 16).  The Court is not persuaded.

At step two, an ALJ must consider the severity of a claimant's impairments. 20 C.F.R. § 416.920(a)(4)(ii).  "An impairment or combination of impairments is not severe if it does not significantly limit" a claimant's "physical or mental ability to do basic work activities."  20 C.F.R. § 416.922(a).  At step two, if an ALJ finds that a claimant does not have a severe impairment or combination of impairments that meets the duration requirement, the ALJ must find that the claimant is not disabled and not proceed to the next steps.  20 C.F.R. § 416.920(a)(4)(ii).

Here, the ALJ found that Mr. Porter's impairments were not severe within the meaning of the Social Security Act and explained that Mr. Porter's impairments had not resulted in more than minimal work-related limitations. (Doc. 11-3, p. 25). In making this finding, the ALJ cited evidence from Mr. Porter's disability report, two function reports, and testimony from Mr. Porter at the ALJ hearing. (Doc. 11-3, pp. 26-27). The ALJ discussed how Mr. Porter initially alleged that he was unable to work because he had a problem with his ankle and could not straighten his ring finger, but that he later stated he could not hold anything at all in his left hand. (Doc. 11-3, p. 26; Doc. 11-7, p. 3). The ALJ discussed various inconsistent claims made by Mr. Porter in his two function reports. (*See* Doc. 11-3, pp. 26-27; Doc. 11-3, pp. 38-39). These inconsistencies support the ALJ's step two finding.

The ALJ also discussed and relied on Dr. Heilpern's opinion that Mr. Porter's impairments of hypertension and minimal degenerative joint disease were non-severe impairments. (Doc. 11-3, p. 27; Doc. 11-4, p. 11). In his report, Dr. Heilpern explained that Dr. Fuller's assessment was "an overestimate of the severity of the individual's restrictions/limitations" based on a review of the x-rays. (Doc. 11-4, p. 12). Dr. Heilpern's opinion supports the ALJ's finding that Mr. Porter did not have a severe impairment or combination of impairments. The ALJ did not have to give deference to the examining physicians' opinions; the ALJ properly found, with

adequate explanation, Dr. Heilpern's opinion more persuasive that Dr. Warren's opinion and Dr. Fuller's opinion. *See Harner*, 38 F.4th at 894.

As discussed, the ALJ was not persuaded by Dr. Fuller's report of his examination of Mr. Porter because Dr. Fuller largely relied on range of motion exams, which the ALJ noted were "subject to self-limitation." (Doc. 11-3, p. 27). In contrast, Mr. Porter's x-ray results were objective and did not support severe restrictions on Mr. Porter's manual grip strength and dexterity. (Doc. 11-3, p. 27). The ALJ found Dr. Warren's physical capacities report unpersuasive for similar reasons. (Doc. 11-3, pp. 27-28).

Therefore, substantial evidence supports the ALJ's finding at step two that Mr. Porter did not have a severe impairment or combination of impairments that significantly limited his ability to perform work-related activities for 12 consecutive months.

Mr. Porter argues that the ALJ erroneously omitted the Grid Rules from his analysis. (Doc. 13, p. 16). Mr. Porter argues that he was entitled to disability benefits pursuant to Grid 201.1 or Grid 201.2 if he was limited to sedentary work. (Doc. 13, p. 16). The argument overlooks the fact that the ALJ did not determine that Mr. Porter was limited to sedentary work. Because the ALJ completed his evaluation at step two, he did not have to assess Mr. Porter's residual functional capacity. 20 C.F.R. § 416.920(a)(4).; 20 C.F.R. § 416.920(c). Inasmuch as the Grid

Rules are based on a claimant's age, education, and work experience, the Grid Rules do not apply when an ALJ finds a claimant does not have a severe impairment at step two.  20 C.F.R. § Pt. 404, Subpt. P, App. 2.

Similarly, because the ALJ's analysis properly ended at step two, Mr. Porter's argument regarding the VE's testimony, which is relevant at step four, does not provide a basis for relief.  Because the ALJ did not rely on VE testimony, Mr. Porter's argument concerning the testimony fails.

## CONCLUSION

For the reasons discussed above, the Court affirms the decision of the Commissioner of Social Security.

**DONE** and **ORDERED** this July 27, 2023.

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE